IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GREGORY L. BROWN,

    Plaintiff,                                No. CIV S-04-0055 LKK GGH P

   vs.

D.L. RUNNELS, et al.,

    Defendants.                      FINDINGS & RECOMMENDATIONS

_____/

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is plaintiff's October 4, 2004, motion for partial summary judgment and defendant Rose's November 21, 2005, cross-motion for summary judgment. While plaintiff alleges that he is moving for partial summary judgment, it appears that his motion addresses all of his claims.

        After carefully considering the record, the court recommends that plaintiff's summary judgment motion be denied, and defendant's summary judgment motion be granted.

SUMMARY JUDGMENT STANDARDS UNDER RULE 56

        Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

1

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On September 9, 2004, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

DISCUSSION

This action is proceeding on the amended complaint filed May 28, 2004. The remaining defendant is Correctional Officer Rose. Plaintiff alleges that defendant Rose delayed in delivering packages of typewriter ribbon that plaintiff had special ordered in retaliation for plaintiff filing a grievance against him.

*Legal Standard*

Prisoners cannot be retaliated against by prison officials for filing inmate grievances. Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, [footnote 5], and (5) the action did not reasonably advance a legitimate correctional goal." Id., 567-568.

In Rhodes v. Robinson, the Ninth Circuit also indicated that an allegation of harm could be sufficient if the inmate could not allege a chilling effect:

> If Rhodes had not alleged a chilling effect, perhaps his allegations that he suffered harm would suffice, since harm that is more than minimal will almost always have a chilling effect. Alleging harm and alleging the chilling effect would seem under the circumstances to be no more than a nicety. See, e.g., Pratt, 65 F.3d at 807 (deciding that alleged harm was enough to ground a First Amendment retaliation claim without independently discussing whether the harm had a chilling effect); Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989)(same).

408 F.3d at 568 n. 11.

*Undisputed Facts*

The following facts are undisputed.

On January 18, 2002, defendant Rose was assigned to the Receiving and Release (R & R) Facility in Facility D at High Desert State Prison (HDSP). Defendant Rose's

\\\\\

1 responsibilities included processing inmates upon their arrival to HDSP and issuing property and
2 packages to inmates.

3       In his declaration, defendant Rose describes the procedures by which packages to
4 inmates are processed.  Plaintiff does not dispute this description.  Accordingly, the court finds it
5 to be undisputed:

> 4. During the time period relevant to this action inmates could receive two types of packages: quarterly packages from family members and packages from approved vendors.  The quarterly packages can include clothing, cosmetics, approved non-perishable food items, among other things. The quarterly packages cannot weigh more than thirty pounds. [Footnote omitted.] Vendor packages included things such as televisions, radios, music, and non-perishable items (typewriter ribbon).
>
> 5. The procedure for delivering packages to inmates during the relevant time period is as follows: Packages arrive at the main R & R unit at HDSP.  Upon arrival, the packages are placed on a list and then delivered to the individual facilities where the inmates are housed.  There are five facilities (also referred to as "yards") at HDSP: A, B, C, D and E.  Each individual facility has its own R & R satellite office where the inmates may pick up their packages.
>
> 6. The packages are delivered to the individual facilities along with a list with the names of the inmates who have packages to pick up.  The list notifies staff and inmates who the inmates are that need to be released to pick up their packages.  When an inmate is released to pick up a package, he reports to the R & R window at his facility to claim the package. For example, inmate Brown would have to report to the facility D R & R to pick up his packages since that is where he was housed during the relevant time period.
>
> 7. Furthermore, once the packages are delivered to the facility R & R, they remain there until picked up by the inmates.  The inmates may pick up their packages at any time during open hours after they have been notified that the packages are at the facility.

20       It is undisputed that on January 18, 2002, plaintiff filed a grievance against
21 defendant Rose claiming that he refused to deliver plaintiff's quarterly packages to plaintiff's
22 cell.  In this appeal, plaintiff wrote that on that day he gave defendant a form stating that his
23 packages were to be delivered to his cell.  Plaintiff claimed that defendant stated to him, "I'm not
24 going to be delivering packages to any motherfucking buildings...either receive your fucking
25 packages now or its going to get lost.  And if I ever have to go through this shit with you again,
26 I'm going to make sure that all your packages get lost."

It is undisputed that on December 28, 2001, and January 11, 2002, the main R & R received special orders of typewriter ribbons for plaintiff.

It is undisputed that the typewriter ribbon that arrived at the main R & R on December 28, 2001, was delivered to the Facility D R & R on January 29, 2002. It is undisputed that the typewriter ribbon that arrived at the main R & R on January 11, 2002, was delivered to the D Facility R & R on February 6, 2002.

Plaintiff did not receive his typewriter ribbons until April 15, 2002.

*Analysis*

Plaintiff claims that defendant Rose delayed in giving him his typewriter ribbon in retaliation for him filing the grievance against him on January 18, 2002. Approximately 2 ½ months passed from the time the typewriter ribbon reached the Facility D R & R to when it was delivered to plaintiff.

Defendant argues that he did not have a retaliatory motive because plaintiff's typewriter ribbon could not be delivered sooner for three legitimate penological reasons: 1) a backlog of packages at R & R; 2) plaintiff's refusal to accept his package; and 3) subsequent lockdowns on D Facility:

> 16. During the relevant time period, facility D R & R was behind four to six weeks in delivering packages to inmates. The backlog was due largely in part to the Holiday season and quarterly packages. The month of December is the busiest month of the year for R & R because it [is] the last month of the fourth quarter and families hold on to their quarterly packages until Christmas time so that the inmates will have "Christmas" packages. Unlike the other quarters, where quarterly packages arrive steadily throughout the quarter, the fourth quarter generally receives a high volume of packages during the month of December.
>
> 17. Other facilities also had a backlog. In fact, the backlog in Facility D was better than the backlog in other facilities which could be as long as 8 to 10 weeks. As a result, it was not uncommon that on some days, the facility D R & R would be closed and staff re-directed to other facilities to assist with their backlog. On such days, there would be no distribution of packages in facility D. It is my belief that this fact also contributed to the delay in plaintiff getting his packages.

*****

\\\\\

6

23. A review of the R & R printout for inmate Brown shows that on January 29, 2002, the special purchase order for inmate Brown received on January 11, 2002 was taken to the yard for inmate Brown to claim. The vendor package, however, was not received because the inmate refused to pick it up pending a CDC 602 appeal. The vendor package was subsequently issued on April 15, 2002. See, Attachment C, R & R Printout for Inmate Brown.

24. A review of the R & R printout also reveals that on February 6, 2002, the special purchase order for inmate Brown received on December 28, 2001, was taken to the yard for inmate Brown to claim. The vendor package, however, was not delivered because the inmate refused to pick it up pending a CDC 602 appeal. The vendor package was subsequently issued on April 15, 2002. See, Attachment C, R & R Printout for Inmate Brown.

25. A review of the records also reveals that there were a series of short lock-downs in facility D during the relevant time period. Specifically, on February 6, 2002, a lock-down was instituted based on an inmate assault on another inmate which resulted in the death of the assault victim. On February 13, 2002, all but the White inmate population on facility D were unlocked. On or about March 3, 2002, there was another incident where an inmate was battered by three other inmates in facility D. There was a brief 2 day lock-down for Black inmates following the incident. Black inmates were unlocked on March 5, 2002. On April 1, 2002, there was another incident where an inmate resisted staff requiring the use of force. During the alarm, inmates refused to comply with orders to get down. Due to the seriousness of the incident, the entire inmate population in Facility D was placed on lock-down status.

26. Anytime there are incidents of this nature, normal programming is disrupted for a period of time necessary to regain control of the situation and ensure the safety and security of staff and inmates. During that time, the policy at HDSP was not to deliver packages to inmates during a lock-down. The policy has since been changed due to the back-log created by holding on to packages during lockdowns. Accordingly, packages are now delivered during lock-downs as well.

In his verified opposition to defendant's motion, plaintiff denies that he ever refused to accept his typewriter ribbons. Opposition, ¶ 10. Accordingly, the court finds that this fact is disputed.

Plaintiff also disputes defendant's statements that the delay in the delivery of his typewriter ribbon could have been caused by a backlog in deliveries and lockdowns. In his opposition, plaintiff states that from January 1, 2002, to April 15, 2002, he can recall only one lock-down that lasted from three to four days. Opposition, ¶ 11. Plaintiff's statement that he can only remember one lock-down, while somewhat conclusory and vague, is adequate to oppose defendant's evidence that several lock-downs occurred during this time.

1    Plaintiff also states that there was no backlog of packages in Facility D during the
2 relevant time.  Plaintiff states that between January 1, 2002, and April 15, 2002, he spoke with
3 "umpteenth prisoners" who received packages and special orders.  Opposition, ¶ 12.  Plaintiff
4 states that he asked them how long it took them to receive their packages from the date it was
5 ordered to the date it was received and they said 30 to 40 days.  Id.  Plaintiff's statement that
6 "umpteenth prisoners" received their packages is based on hearsay and not adequate evidence to
7 oppose defendant's evidence that the delay in delivery of packages was caused by a backlog.  Id.

8    Whether or not defendant delayed the delivery of plaintiff's typewriter ribbon
9 based on a retaliatory motive is disputed.  Plaintiff's statement in the 602 that defendant
10 threatened to lose his packages is evidence of a retaliatory motive.  While lockdowns and a
11 backlog of deliveries could have contributed to the delay in the delivery of the ribbon, it is
12 disputed that these circumstances actually caused the delay.  Accordingly, neither plaintiff or
13 defendant is entitled to summary judgment on this ground.

14    Defendant also argues that he is entitled to summary judgment on grounds that the
15 delay in the delivery of the typewriter ribbon did not chill plaintiff's exercise of his constitutional
16 rights.  Defendant also suggests that the only harm plaintiff suffered is de minimis.

17    The court agrees that plaintiff has not demonstrated that the delay in the delivery
18 of his typewriter ribbon chilled his exercise of his constitutional rights.  He does not allege, for
19 example, that defendant's conduct prevented him from filing additional administrative appeals.

20    However, as noted above, the lack of an actual chill does not end the analysis.
21 Any significant harm suffered as a result of retaliation on account of protected conduct remains
22 actionable regardless of actual chill.  Nevertheless, nothing to excess, and there are harms so
23 insubstantial in nature which should not be the concern of federal courts.

> In sum, language from the cases, including our decision in
> Stavropoulos, requiring an adverse employment action in order for
> a public employee to state a retaliation claim does not necessitate
> that a private citizen plaintiff plead more than that the defendant's
> retaliatory acts are such as would chill a person of ordinary

> firmness. As we have stated, for private citizen plaintiffs, the objective test allows for a "weeding out" function when the injuries complained of are trivial or amount to no more than de minimis inconvenience in the exercise of First Amendment rights.

Bennett v. Hendrix, 423 F.3d 1247, 1253 ( 11th Cir. 2005). See also Dawes v. Walker, 239 F.3d 489, 493 (2d Cir.2001) (failure to meet objective test reveals that "the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection") and the latter to ensure that there is an injury sufficient to grant standing); Thaddeus-X v. Blatter, 175 F.3d 378, 396 (6th Cir. 1999) ("It is not necessarily true, however, that every action, no matter how small, is constitutionally cognizable. See Ingraham v. Wright, 430 U.S. 651, 674, 97 S. Ct. 1401, 51 L.Ed.2d 711 (1977) 'There is, of course, a de minimis level of imposition with which the Constitution is not concerned.'").

In applying an objective harm test in the prison context there are two countervailing factors to consider. First, it is prison after all, and society should not expect that relationships between prisoners and the corrections personnel will be nothing but harmonious. Day to day nits in that relationship are not fit for federal court review. On the other hand, prison is different from the free world in that things which are relatively insignificant or taken for granted in the free world take on a larger significance in prison simply due to the fact that prisoners have so little in the way of permitted things or privileges. What might be deemed trivial in everyday life may well seem very important within prison walls.

With the above in mind, the court finds that delay in receipt of a typewriter ribbon, even in the prison context, is de minimis. Plaintiff still had the ability to correspond by putting pen to paper; he may well have been able to borrow a co-prisoner's typewriter. We should not have to empanel a number of citizens as jurors with the significant disruption to their lives, take up a district judge's time, to determine the why's and wherefore's of typewriter ribbon delay. Judicial resources are not inexhaustible and should be put to better use. Because plaintiff did not suffer a significant adverse action, summary judgment should be granted to defendant.

1   Accordingly, IT IS HEREBY RECOMMENDED that:

2   1. Plaintiff's October 4, 2005, summary judgment motion be denied;

3   2. Defendant's November 21, 2005, summary judgment motion be granted.

4   These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  5/11/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
br55.sj